**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3522-21

WILMINGTON SAVINGS
FUND SOCIETY, FSB,
d/b/a CHRISTIANA TRUST,
as owner trustee of the
RESIDENTIAL CREDIT
OPPORTUNITIES TRUST V,

     Plaintiff-Respondent,

v.

MITCHELL MINCHELLO
and DEANNA MINCHELLO,

     Defendants-Appellants,

and

J HOFERT COMPANY,
FIA CARD SERVICES NA,
SCHUMANN HANLON LLC,
DISCOVER BANK,
VANZ LLC-DECEMBER 10
SERIES01, MRI-WEST MORRIS
ASSOCIATES, and STATE OF
NEW JERSEY,

     Defendants.

_____

Argued November 9, 2023 – Decided December 8, 2023

Before Judges Accurso and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. F-007982-15.

Javier L. Merino argued the cause for appellants (The Dann Law Firm, PC, attorneys; Javier L. Merino, on the briefs).

Mark A. Roney argued the cause for respondent (Hill Wallack, LLP, attorneys; Francesca A. Arcure, on the brief).

PER CURIAM

In this contested residential mortgage foreclosure, defendants Mitchell and Deanna Minchello appeal from the entry of summary judgment striking their answer and denying their cross-motion for "leave to file a third-party complaint or seek monetary damages based on insurance proceeds or trial loan modification payments allegedly improperly retained by [plaintiff's servicer] FCI Lender Services, Inc.," the order denying their motion for reconsideration, and the subsequent final judgment.  Defendants contend plaintiff breached its trial payment plan with them and violated the covenant of good faith and fair dealing by "refusing to disburse defendants' insurance proceeds and forcing defendants' home to remain in disrepair"; that the trial court applied an

2                                                                    A-3522-21

improper standard in deciding their motion for reconsideration and twice improperly denied their requests for oral argument; and that a "remand is necessary for the trial court to clarify inconsistencies in its summary judgment and reconsideration decisions." Our review of the record convinces us that none of those arguments merits reversal of the judgment.

Although this case has a lengthy and convoluted procedural history, and the parties disagree on several points, the essential facts are undisputed. Defendants borrowed $522,000 from Bank of America in January 2007, secured by a thirty-year purchase money mortgage on their home in Mt. Arlington. Defendants stopped making their loan payments in 2010, and in 2012 they stopped paying the taxes and insurance on the property.

In 2014, Bank of America assigned the note and mortgage to Christiana Trust, a Division of Wilmington Savings Fund Society, FSB, as Trustee of ARLP Trust 3. Christiana Trust filed this foreclosure action in March 2015. Although defendants filed an answer, they subsequently entered into a consent order in December 2015, deeming their answer non-contesting, waiving formal notice under Section 6 of the Fair Foreclosure Act and returning the matter to the Office of Foreclosure to proceed as an uncontested manner in exchange for

3

plaintiff's agreement to delay its application for final judgment for four months, that is until April 2016.

Two weeks after entering that consent order, Christiana Trust assigned the note and mortgage to Wilmington Savings Fund Society, FSB, as Trustee for Stanwich Mortgage Loan Trust A. Stanwich's servicer was Carrington Mortgage Services, LLC. Stanwich substituted in as the foreclosing plaintiff in April 2017.

Thereafter, defendants sought a loan modification from Carrington. In November 2017, defendants provided Carrington a 2016 profit and loss statement, which Carrington interpreted as demonstrating defendants had monthly net income of $7,188.56. In its brief on appeal, defendants refer to the statement bearing both their signatures as an undated profit and loss statement they "purportedly submitted to Carrington," which does "not state whether the $7,188.85 income was a monthly or yearly income."

On November 29, 2017, Carrington provided notice to defendants that the servicing of their mortgage loan was being transferred to FCI Lender Services, Inc. effective December 14, 2017. Two days later, on December 1, Carrington sent defendants a trial modification offer on behalf of Stanwich requiring three monthly payments of $3,216. In the first paragraph in bold

4

type, the offer states: "To accept this offer we must receive your initial [trial period plan] Payment which is due on or before 01/01/2018."

Five days later, on December 6, 2017, defendants filed a bankruptcy petition under Chapter 13. The following day, December 7, defendant Deanna Minchello drove her car into defendants' home, resulting in structural damage.

On December 13, 2017, defendants filed a statement in their bankruptcy action certifying to a combined monthly income of $3,871. Two days later, Carrington sent defendants a notice cancelling the trial plan offered on December 1 because Carrington was no longer servicing defendants' loan.[1] Defendants nevertheless sent the new servicer, FCI, a check in the full amount of the monthly trial payment dated January 1, 2018, which was posted on January 8.

On January 22, 2018, Stanwich assigned the note and mortgage to plaintiff, Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, as owner trustee of the Residential Credit Opportunities Trust V. On February 7, FCI sent defendants a letter advising them their "request for a loan

---

[1] Defendants admitted in response to plaintiff's statement of material facts that Carrington sent the cancellation notice, and they did not deny receipt. They denied only that Carrington had authority to rescind the offered trial period payment plan.

A-3522-21

modification [was] denied due to failure to accept our modification offer."

Defendants sent FCI a second check in the full amount of the monthly trial payment dated the same date as FCI's denial letter, February 7, 2018, which was not received by FCI until February 20. Defendants thereafter sent a third check in the same amount dated March 12, 2018, which FCI received on March 20.[2] At about that time, Merrimack Mutual Fire Insurance Company issued its check for $26,160.89 under the forced-placed policy for the property damage defendant Deanna Minchello caused the prior December.

Plaintiff claimed its servicer engaged in further negotiations with defendants throughout the early part of 2018 in the hope of structuring a loan modification around the cancelled trial payment plan offered by Carrington but was never able to secure sufficient proof of income from defendants. Plaintiff contended the profit and loss statement defendants provided in April 2018 claimed an average net monthly income of $6,592.02 and another, five months later, claimed an average net monthly income of $8,000. Plaintiff claimed none of the statements ever jibed with one another or the figures provided to the bankruptcy court certifying plaintiffs' monthly income as $3,871, and

---

[2] All three payments were posted to a suspense account. FCI refused further payments after March 2018.

A-3522-21

defendants never provided proof to support any of them. Plaintiff contended defendants also failed to submit the report of the claims adjuster or any quote from a contractor and proof of the satisfactory completion of the repairs necessary to release the insurance proceeds.

Defendants claimed they were entitled to a permanent loan modification because they had a binding trial payment plan with FCI, made their trial plan payments on time, and forwarded additional financial information to FCI as requested. They claimed that although they were advised in February 2018 that their request for a loan modification had been denied, plaintiff's servicer (not FCI) subsequently thanked them in an email in March for their "timely payment of the initial three payments of your Trial Payment Program." Defendants further claimed FCI failed to provide them a permanent modification after acknowledging they'd made "timely payment" on their trial plan, writing to them in April that they were "not currently eligible for a loan modification due to failure to provide all loan documentation requested." Defendants argued the trial plan did not provide plaintiff and its servicer the unilateral right to demand review of their financials because the trial payment plan "did not permit the lender to demand such a review." Finally, defendants claimed they provided all the information plaintiff and its servicer required to

 A-3522-21

obtain the insurance proceeds and were wrongly denied them without explanation.

Plaintiff substituted in for Stanwich in March 2018. Following the bankruptcy court's order vacating the automatic stay to permit plaintiff to pursue its mortgage foreclosure, plaintiff filed an amended complaint in April 2018. Defendants, with new counsel, answered a year later in April 2019. Plaintiff moved for summary judgment in June. Defendants opposed the motion and cross moved to sever their "ancillary affirmative claims" against non-party FCI, or in the alternative, to permit an amended answer and third-party complaint against FCI.

The judge granted plaintiff's motion for summary judgment without oral argument, notwithstanding defendants had requested argument, in a written opinion. The judge found no dispute over the validity of the note and mortgage, defendants' default in 2010 and plaintiff's standing to foreclose the mortgage. See Thorpe v. Floremoore Corp., 20 N.J. Super. 34, 37 (App. Div. 1952) (holding the defendant's concession of "the execution, recording, and non-payment of the mortgage" established the plaintiff's right to foreclosure).

The judge rejected defendants' claim that their performance of the trial period plan was an effective equitable defense to the foreclosure. She found

the trial loan modification offered by Carrington was not enforceable because Carrington revoked the offer before any performance by defendants. See Am. Handkerchief Corp. v. Frannat Realty Co., 17 N.J. 12, 17 (1954) (noting a "mere offer" not supported by consideration "is not a contract and 'has, of course, no binding force either at law nor in equity,' on the offeror," who "may revoke it so long as he does so before the offeree accepts it") (quoting 5 Williston on Contracts §1441 (rev. ed.)).

The judge found no legal basis for defendants' assertion that Carrington's purported revocation of its offer on December 15, 2017, was ineffective because it had been relieved as Stanwich's servicer the day before. And although expressing the view that defendants may have identified "inequitable and potentially improper conduct on the part of FCI" in continuing "to accept and apply [defendants'] trial loan mod[ification] payments," the judge found the argument "fails to account for why defendants continued to make payments after they had received notice their trial loan mod[ification] offer had been revoked."

"Given the revocation of the trial loan mod[ification] offer prior to defendants' performance, defendants' inconsistently stated income, and defendants' failure to provided adequate proof of income," the judge rejected

defendants' claim the trial payment plan presented a viable defense to foreclosure. And although finding defendants' allegations with respect to retention of the three trial payments and the insurance proceeds "troubling," the judge denied defendants' cross-motion for leave to file a third-party complaint or a separate complaint against FCI in the Law Division as to those payments, concluding "the appropriate method for defendants to seek credit for those payments is through an objection to the amount claimed due by plaintiff" when it moved for final judgment. The judge granted defendants' motion to sever its ancillary statutory claims against FCI under the Real Estate Settlement Procedures Act to permit defendants to pursue those claims in the Law Division.

Defendants moved for reconsideration, contending the March 2018 email to defendants from plaintiff's servicer thanking defendants on their timely payments and representing an agent would contact them with regard to a permanent loan modification established the trial plan had never been revoked, defendants made their payments timely, and the parties contemplated execution of a permanent loan modification. Defendants also asked the court to reconsider its decision limiting defendants' remedy for the alleged wrongfully retained insurance proceeds to a credit against the amount due,

contending to do so stripped them of their right to hold plaintiff and FCI accountable under the Consumer Fraud Act and violated the contractual terms of the mortgage.

The judge denied the motion in a written opinion, again denying defendants' request for oral argument. Accepting defendants' erroneous statement that the motion was governed by Rule 4:49-2, the rule governing reconsideration of a final judgment instead of Rule 4:42-2, the rule governing reconsideration of interlocutory orders, the judge found defendants had been in possession of the March email from plaintiff's servicer since the servicer sent it to them in 2018, and its existence did not change the fact that the modification plan was withdrawn by Carrington before it was accepted by defendants, meaning no modification plan ever came into existence.

As for FCI's alleged wrongful retention of the insurance proceeds, the judge noted defendants relied in reconsideration on the same email they'd sent to plaintiff's servicer that they relied on in opposing plaintiff's motion for summary judgment. The court found that email, which defendants' claim provided the information plaintiff claimed was missing from their application for the insurance proceeds, listed only the file names of the documents supposedly attached to the email. Defendants hadn't included the actual

11

documents in the summary judgment record, either initially or on reconsideration, thus rendering them unable to establish plaintiff's servicer had wrongly retained the insurance proceeds under the terms of the mortgage.

The court thus refused to reconsider its ruling that plaintiff established its entitlement to summary judgment striking defendants' answer and that defendants were only entitled to a credit at final judgment against the amount claimed due for the three trial payments and the insurance proceeds they claim FCI wrongly retained. Although the summary judgment order states "defendant[s] are DENIED leave to file a third-party complaint or seek monetary damages based on insurance proceeds or trial loan modification payments allegedly improperly retained by FCI," the court stated it was without "authority to limit defendants' right to file affirmative claims against a non-party in the Law Division and never claimed to have such authority in the September 11, 2019" summary judgment order.

The court explained it restricted defendants' claim against plaintiff for the amount of the trial payments and the insurance proceeds to a credit against the amount due at the time of final judgment "but severed defendants' claims against non-party FCI and allowed defendants to file a complaint in the Law Division." The court noted defendants did not need to "seek leave from this

court to file a claim against a non-party in the Law Division for matters unrelated to the foreclosure."

The court subsequently granted plaintiff final judgment, over defendants' objection, which was entered on the recommendation of the Office of Foreclosure in June 2022.  Defendants' home was struck off to plaintiff at sheriff's sale the following November after defendants' motion to stay the sale was denied by the trial court, this court and the Supreme Court.

On appeal, defendants do not dispute they received a credit of $35,808.89 for the three trial plan payments amounting to $9,648 and the insurance proceeds of $26,160.89, against the total amount due of $1,037,328.01, resulting in a final judgment amount of $1,001,519.12.  They also do not dispute the property was sold at sheriff's sale.  Although plaintiff claims that moots this appeal, defendants contend our Supreme Court in GMAC Mortgage, LLC v. Willoughby, 230 N.J. 172, 189-90 (2017) held a mortgagor is entitled to a remedy for a lender's breach of a loan modification even in the event the property has been sold at sheriff's sale, and thus the appeal is not moot.  Defendants also contend the appeal is not moot because a ruling by this court overturning the orders appealed from "would have a direct

effect" on the litigation in which the parties and FCI are engaged in federal court.

We are satisfied the case is not moot because leaving aside that the property was struck off to plaintiff and not sold to a third-party, defendants are entitled to a ruling on their claims that the trial court erred in finding there was no enforceable loan modification agreement and that plaintiff did not act in bad faith in its handling of the insurance proceeds, either of which they claim should have precluded plaintiff's resort to the equitable remedy of foreclosure. See ibid. Whatever practical effect our ruling may have on the parties' federal court action, however, is none of our concern, and we do not take it into account in deciding this appeal.

As we've already noted, although the procedural history is long and complicated with the parties' appendices exceeding 800 pages, the legal issues are straightforward, and we have no hesitation in holding plaintiff established its entitlement to both summary judgment, see Great Falls Bank v. Pardo, 263 N.J. Super. 388, 394 (Ch. Div. 1993) ("The only material issues in a foreclosure proceeding are the validity of the mortgage, the amount of the indebtedness, and the right of the mortgagee to resort to the mortgaged premises.") and final judgment on the undisputed facts in this record. See R.

4:46-2(c); <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 540 (1995) (providing summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law).

Defendants do not dispute that Carrington's tender of the loan modification agreement in December 2017 on behalf of Stanwich was only a unilateral offer. <u>See</u> <u>Arias v. Elite Mortg. Group, Inc.</u>, 439 N.J. Super. 273, 279 (App. Div. 2015) (characterizing a trial period payment plan, in which a mortgagee promises a loan modification if the mortgagor complies with the obligations established by the plan, as a unilateral offer). "In a unilateral contract, one party's promise becomes enforceable only on the performance of the other party's obligation." <u>Iliadis v. Wal-Mart Stores, Inc.</u>, 191 N.J. 88, 109 (2007). Defendants thus acknowledge their receipt of Carrington's letter withdrawing its unilateral offer before defendants accepted it would ordinarily render the modification agreement unenforceable. <u>See</u> <u>Am. Handkerchief Corp.</u>, 17 N.J. at 17 (setting forth "the usual rule" that an "offeror may revoke [his offer] so long as he does so before the offeree accepts it"); <u>Restatement (Second) of Contracts</u>, § 42 (1991) ("An offeree's power of acceptance is

terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract.").

Defendants contend, however, that Carrington lacked the authority to revoke its offer for the same reason Carrington gave defendants for revoking the offer — that Carrington was no longer servicing the loan on behalf of Stanwich, which itself was in the process of selling defendants' loan to plaintiff, and thus had no authority to bind either Stanwich or plaintiff to a loan modification scheduled to start the first of January. Indeed, the first line of the offer stated unequivocally that defendants were "eligible for a permanent Loan Modification with Carrington . . . current servicer and authorized agent" for Stanwich. Defendants provide no authority for their contention that Carrington was not free to revoke its own offer, before acceptance, on the transfer of its servicing responsibilities to a new entity in connection with the sale of the loan to plaintiff. We are certainly not aware of any.

Even had we any doubt about Carrington's ability to revoke its offer here, which we do not, defendants were not entitled to a permanent loan modification, as a matter of law, because they failed to perform in accordance with the terms of the offer. The offer states unequivocally that "To accept this

16

offer we must receive your initial [trial period plan] payment which is due on or before 01/01/18." It's undisputed the new servicer, FCI, the payee on defendants' check dated January 1, 2018, and the entity to which defendants directed their payment, did not receive it on that date. The check was not posted until January 8, 2018.

Although defendants contend the agreement only required the trial payments "to be made by the end of the month," because it provides "[e]ach trial payment must be applied to your account before the end of the month in which it is due or you will risk losing your eligibility for a permanent Loan Modification," we agree with the trial court that language did not alter the trial plan's plainly stated requirement that the initial payment was due on January 1, 2018, with the subsequent payments due February 1, and March 1, 2018.

The construction of contract language is generally a question of law unless its "meaning is both unclear and dependent on conflicting testimony." Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92 (App. Div. 2001). As neither party submitted any extrinsic evidence of contractual intent on summary judgment, the record before the court was limited to the language of the agreement. See Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 (2016). Our review of the language is de novo. Kieffer v. Best Buy, 205 N.J. 213, 222

(2011). We owe "no special deference to the trial court's interpretation and look at the contract with fresh eyes." Id. at 223.

This agreement is no model of draftsmanship. As our Supreme Court has observed, "[l]ooseness of language ofttimes suggests confusion of ideas in the user's mind that of necessity tends to confound the process of interpretation." George M. Brewster & Son, Inc. v. Catalytic Constr. Co., 17 N.J. 20, 32 (1954) (quoting Corbin on Contracts § 534).[3] "In the uncertainty of usage," we seek "the meanings each party intended to convey by his words and acts, and for the meanings these words and acts conveyed to the other party." Ibid.

"To fulfill our interpretative mission, we determine 'the reasonably certain meaning of the language used, taken as an entirety, considering the situation of the parties, the attendant circumstances, the operative usages and practices, and the objects the parties were striving to achieve.'" Ace Am. Ins. Co. v. Am. Med. Plumbing, Inc., 458 N.J. Super. 535, 539 (App. Div. 2019) (quoting George M. Brewster, 17 N.J. at 32). Although "[p]overty of language

---

[3] The Court further noted, however, that "as Professor Corbin says, '[a] clear and definite mind is a rarity; an artist in the use of words is as great a rarity.'" George M. Brewster, 17 N.J. at 32 (quoting Corbin on Contracts § 534).

A-3522-21

is sometimes a factor . . . whatever the difficulty, the chosen words and phrases are to be realistically assessed, in relation to the context and the obvious general purpose of the compact, for the meaning that is reasonably clear, such as is within the reasonable understanding of the symbols of expression." George M. Brewster, 17 N.J. at 32.

Applying those principles here, we cannot find any actual ambiguity as to when trial payments were due under the agreement. As we have noted before, the obvious purpose of a trial period plan preceding a permanent loan modification is to permit the borrowers "to demonstrate that, despite their inability to make their regular mortgage payments, they were at least financially reliable enough to make timely payments in the reduced amount stated in the [trial period plan] Agreement." Arias, 439 N.J. Super. at 279. Although defendants paid the reduced monthly amount due under the plan, not one of their three payments was made on the due date. All were late.

As defendants contend, Carrington reserved its right to terminate the trial period plan if payments were "not received and applied to your account before the end of the month in which the payment is scheduled to be made." The agreement, however, also expressly provides that the plan "is not a permanent modification," that defendants were required to "make all of [their]

19

[trial period plan] payments on time and continue to meet all program requirements before [Carrington] can offer you a final Loan Modification," and that Carrington would "not be obligated or bound to make any modification of the Loan Documents if you fail to meet any one of the requirements under this Plan." Thus, realistically assessing the words "in relation to the context and the obvious general purpose" of the trial plan, George M. Brewster, 17 N.J. at 32, it is more than "reasonably clear" that although late payments, so long as applied to defendants' account by the end of the month in which the payments were due, would not permit termination of the trial plan, they would allow Carrington to decline a permanent loan modification in accordance with the express terms of the agreement.

This case bears no resemblance to Gonzalez v. Wilshire Credit Corp., 207 N.J. 557 (2011) or Willoughby, cases in which the Court excoriated the practice by mortgagees and servicers of entering into post-judgment forbearance agreements with borrowers that effectively turned them into "cash cow[s]" without ever providing them new mortgages. Gonzalez, 207 N.J. at 570; Willoughby, 230 N.J. at 188. Defendants were not induced to make trial plan payments on the promise of a permanent loan modification here.

Carrington revoked the trial plan offer before defendants made a single payment.

And unlike the trial court, we do not find FCI's retention of defendants' three trial payments troubling for two reasons. First, as already noted, FCI did not solicit those payments; defendants made them voluntarily with the knowledge that Carrington had revoked its offer of a trial plan and suggested they contact FCI about their options. Second, defendants were obligated to make their monthly mortgage payment by the terms of the mortgage and the mortgagee was entitled to accept their payments. See Arias, 439 N.J. Super. at 281 n.6. Further, the trial period plan specified that in the event the plan was cancelled or terminated, "any funds in a suspense account shall be credited to your loan pursuant to the terms of your loan documents and shall not be refunded to you."[4] After FCI wrote to defendants in April of its "final denial,"

---

[4] Although we need not reach plaintiff's additional reason for refusing defendants a permanent loan modification, that is their failure to provide sufficient proof of income to support the modification, we agree with the trial court that it provides another reasonable basis for plaintiff's refusal to modify defendants' loan. Although defendants are correct that there is nothing in the trial period plan agreement providing plaintiff the unilateral right to review their "financials," it was not unreasonable for plaintiff to request updated financial information following defendants' bankruptcy filing days after Carrington offered them a trial period plan. See Restatement (Second) of Contracts § 251; Spring Creek Holding Co. v. Shinnihon U.S.A. Co. Ltd., 399

it returned payments defendants made in April, May and June. There is nothing in the record to suggest that plaintiff or its servicer FCI was dangling the prospect of a loan modification in order to squeeze additional payments from defendants.[5]

Defendants' claim that the trial court erred in granting summary judgment to plaintiff on their claim that plaintiff breached the covenant of good faith and fair dealing in retaining the insurance proceeds requires only brief comment. Defendants argue the trial court erred in failing to apply

---

N.J. Super. 158, 179 (App. Div. 2008) (discussing how adequate assurances may be demanded when "reasonable grounds support the obligee's belief that the obligor will breach the contract.") (quoting Danzig v. AEC Corp., 224 F.3d 133, 137 (Fed. Cir. 2000)).

It is undisputed that in their bankruptcy filing, plaintiffs certified on penalty of perjury to a combined monthly income of $3,871, only $655 more than the modified payment (and $637 less than their regular payment of $4,508.96 including taxes and interest), and to monthly expenses of $5,066, leaving a monthly shortfall of $1,195. Plaintiff objected to confirmation of defendants' bankruptcy plan, arguing it was infeasible based as it was on the unsuccessful loan modification. The bankruptcy court entered an order on February 20, 2018, granting plaintiff's motion to deny confirmation and dismissed defendants' petition.

[5] Defendants' counsel in the trial court twice wrote to plaintiff's foreclosure counsel in late 2018 asserting his belief that defendants "negotiated a trial to permanent modification with Carrington, which FCI "failed to properly book" when it took over as servicer in late 2017, in what "appear[ed] to be a loan transfer situation."

Wilmington Savings Fund Society, FSB for Pretium Mortgage Acquisition Trust v. Daw, 469 N.J. Super. 437, 441 (App. Div. 2021) in which we held that "[o]nce the lender is provided with adequate information to determine how the insurance funds should be used—such as the estimated costs of repairs and market values—the lender is obligated" to advise the borrower promptly "as to whether the requested use of insurance monies for repairs is economically infeasible or will impair its security in the property."

Leaving aside that the Daws were apparently current on their mortgage and maintained the required insurance coverages on their home when it suffered catastrophic damage in Superstorm Sandy, the event that precipitated their mortgage default, id. at 442-43 — unlike defendants, who had been in default for seven-and-a-half-years, had been in foreclosure for two years and were without homeowner's insurance when defendant Deanna Minchello drove her car into the mortgaged premises — defendants don't address the trial court's finding that they failed to establish they'd provided plaintiff's servicer with any of the information the servicer required "to determine how the insurance funds should be used," the trigger for application of a Daw analysis. In their brief to this court, defendants simply ignore the trial court's finding

23

that the record contains no proof they provided plaintiff's servicer with any of the documents it requested.

Defendants only repeat their claim that they "submitted all the documents" requested by the servicer. In support, they reference the same letter the trial court found contained only a list of PDF files it purportedly sent the servicer, but not copies of the documents, thus leaving the servicer's certification that defendants failed to produce the requested documents unrebutted on summary judgment. As defendants failed to establish it provided plaintiff "with adequate information to determine how the insurance funds should be used," including the estimated cost of repairs, they could not establish they'd triggered plaintiff's obligation to advise them "within a reasonable period of time as to whether the requested use of insurance monies for repairs [was] economically infeasible or [would] impair its security in the property," Daw, 469 N.J. Super. at 441, even assuming Daw would apply in the case of force-placed insurance where the mortgage had been in default for nearly eight years.[6] Thus, we find no error in the finding that defendants failed

---

[6] Defendants' mortgage provides that in the event the borrower fails to maintain property insurance:

to establish plaintiff breached its covenant of good faith and fair dealing in its handling of the insurance proceeds thereby providing an equitable defense to foreclosure.[7]

> Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the property or the contents of the property against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment."
>
> [Emphasis added.]

[7] In Daw, which was decided two-and-a-half years after plaintiff's receipt of the insurance proceeds, we held that "it seems fair and appropriate for the insurance funds to be placed in an interest-bearing account until their disposition is finally determined." 469 N.J. Super. at 458. Plaintiff's servicer did not hold the insurance proceeds in an interest-bearing account as the mortgage provides that "[u]less an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds."

Defendants assert that assuming arguendo the repairs were economically infeasible, "plaintiff had an obligation to apply the insurance proceeds

We agree with defendants the trial court should have held oral argument on plaintiff's summary judgment motion and defendants' cross-motion to sever defendants' claims against FCI or permit them to file a third-party complaint against it in the foreclosure. See R. 1:6-2(d). Doing so would have likely avoided the confusion over whether the court granted or denied defendants the ability to sue FCI for damages based on its alleged improper retention of the trial period payments and the forced-placed insurance proceeds.

We agree with defendants the trial court initially denied that request limiting defendants to a credit for those sums against the amount due. And although the court denied defendants' reconsideration motion, it clarified its

---

promptly to the mortgage balance, which had the potential to substantially reduce the interest owed." They devote, however, only a paragraph of their brief to that issue. They make no attempt to explain by reference to the mortgage, the nature of force-placed insurance or any published authority when or how the proceeds were to be applied to the mortgage balance or to quantify the "potential" effect on the interest owed or to explain how its effect on the upset price at the sheriff's sale would have made any difference here in the absence of a demonstrated ability to redeem at the reduced amount or of a deficiency action. "Parties are required to make an adequate legal argument" in support of their claims. 700 Highway 33 LLC v. Pollio, 421 N.J. Super. 231, 238 (App. Div. 2011). An issue addressed only by the "mere conclusory statements by the brief writer" does not require our consideration in a written opinion. Nextel of New York, Inc. v. Borough of Englewood Cliffs Bd. of Adjustment, 361 N.J. Super. 22, 45 (App. Div. 2003). We thus do not consider defendants' alternate argument that plaintiff breached its alleged obligation to apply the forced-placed policy proceeds promptly to the mortgage balance.

order "restricted defendants' relief against plaintiff" in the foreclosure "to a credit at final judgment for any payments made to plaintiff and retained by FCI," that it was without "authority to limit defendants' right to file affirmative claims against a non-party in the Law Division," and "severed defendants' claims against non-party FCI and allowed defendants to file a complaint in the Law Division." See R. 4:64-5 (prohibiting the joinder of non-germane claims in a foreclosure action without leave of court).

We express no opinion on the viability of defendants' damage claims against any party or entity, or the effect of this foreclosure action on those claims. As the court's initial order on defendants' cross-motion was subsequently clarified and has not prevented defendants from asserting a claim for damages against FCI in federal district court, it is not grounds for reversal or a remand.

We affirm the trial court's orders that plaintiff established its right to foreclose the mortgage, that defendants did not succeed in establishing plaintiff should be barred from asserting that equitable remedy, and that final judgment of foreclosure was properly entered against defendants. Defendants' remaining arguments, to the extent we have not addressed them, lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

27

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3522-21